UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x

**DEXTER S. MOTTLEY**,

                      Plaintiff,

        — against —

**CARVER BANCORP, INC., CARVER FEDERAL SAVINGS BANK, MICHAEL T. PUGH**, and **LUIS TIO**, individually,

                    Defendants.

------------------------------------------------------------------- x

Case No. 17-CV-_____

**COMPLAINT**

**JURY TRIAL DEMANDED**

This action is brought by Plaintiff, **DEXTER S. MOTTLEY** ("*Mottley*" or "*Plaintiff*"), against his employer, Carver Federal Savings Bank ("*Carver*" or the "*Bank*"), Michael T. Pugh ("*Pugh*"), individually, and Luis Tio ("*Tio*"), individually (collectively, the "*Defendants*").

## NATURE OF THE ACTION

1.      Mottley brings this action against Carver to redress unlawful discrimination in the terms, conditions, and privileges of his employment in violation of Civil Rights Act, 42 U.S.C. § 1981 ("*Section 1981*"), Title VII of the Civil Rights of 1964, 42 U.S.C.A §2000e ("*Title VII*"), New York State Human Rights Law, Executive Law § 290 et seq. ("*NYSHRL*") and the Administrative Code of the City of New York § 8-101 et seq. ("*NYCHRL*") based upon his race.

2.      Mottley, an African American male, further complains that Carver engaged in discriminatory conduct by subjecting Mottley to an egregious hostile work environment in violation of Section 1981, Title VII, the NYSHRL and the NYCHRL.

3.      In addition to damages suffered as a consequence of Defendants' unlawful race discrimination, Mottley alleges that Carver retaliated against him in violation of Section 806 of

the Sarbanes-Oxley Act of 2002 ("*SOX*").

4.      Specifically, Mottley was retaliated against for his good faith and bona fide complaints concerning unethical and unlawful actions undertaken by Carver employees, which complaints were ignored and disregarded by Carver's senior management and compliance and legal divisions.

5.      Carver's retaliatory action against Mottley took place immediately after and in close proximity in time to his complaints as a whistleblower.

6.       Mottley seeks monetary, declaratory and injunctive relief against Defendants for its unlawful actions and other remedies as permitted by applicable law, including but not limited to prejudgment interest, attorney's fees, costs and expenses.

7.      Mottley files this action to seek monetary relief for the denial of equal employment opportunity and for the unlawful employment practices of Defendants.

## JURISDICTION AND VENUE

8.      This court has jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. §§ 1331, as this action arises under 42 U.S.C. § 1981 and 42 U.S.C.A §2000e. This court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a), because the state law claims are so related to Plaintiff's federal claims that they form a part of the same case or controversy between the parties.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) and 29 U.S.C. § 1132(e)(2), because Defendant operates facilities in, and a substantial part of the events giving rise to the claims occurred in, this judicial district.

## PARTIES

10.      Mottley is an individual who resides at 123-60 83rd Avenue, Kew Gardens, New

2

York 11415.

11.    Carver is, at all relevant times herein, a Community Bank licensed to do business and doing business in the City, County and State of New York at 75 West 125th Street, New York, New York 10027, and, during the relevant time described herein, the employer of Plaintiff.

12.    Pugh is an individual who resides at 2196 Frederick Douglas Boulevard, New York, New York 10026.

13.    Tio is an individual who resides at 327 71st Street, Guttenberg, New Jersey.

## FACTS[1]

### GENERAL ALLEGATIONS COMMON TO ALL CLAIMS

14.    On or about August 15, 2011, Mottley began working at Carver as a Credit Analyst in Carver's Credit Department.

15.    In or around January 2013, Plaintiff transferred to the Lending Department, where he began working under Alfredo Assad, Senior Vice President & Chief Loan Officer ("*Assad*").

16.    In or around October 2014, the Bank terminated Assad's employment for cause because he had created fraudulent documentation, which he provided to the Office of the Comptroller of the Currency ("*OCC*"), as more fully described below.

17.    Contrary to the Bank's Lending policy, Assad had not obtained, prior to loan closing, a third-party appraisal for a $9 million loan (total debt stack), $4.5 million Carver participation to borrower MZ Partners, LLC.

18.    When asked by the OCC for the appraisal review, he called third-party review appraiser Amanda Aaron ("*Aaron*") and requested that she prepare the review but omit the date.

19.    Aaron did as Assad requested.

---

[1] All directly quoted statements, unless otherwise specified, are the sum and substance of such statements as recalled by Plaintiff.

20.     James Raborn, Carver's General Counsel ("*Raborn*"), later learned that Aaron performed this act and subsequently released her as the Bank's vendor, as she prepared the loan documentation.

21.     In or around October 2014, Assad's employment was subsequently terminated by the Bank on recommendation of the OCC.

22.     Significantly, the Bank did not file a Suspicious Activities Report ("*SAR*") with the Financial Crimes Enforcement Network ("*FinCEN*"), an agency of the United States Department of the Treasury, and as required under the United States Bank Secrecy Act (BSA) of 1970 following a suspected incident of money laundering or fraud.

23.     A Report of Examination was issued by the OCC to Carver on September 30, 2015, and was subsequently superseded on May 9, 2016, by a Formal Written Agreement ("*Formal Agreement*") wherein, pursuant to 12 CFR 5.151(c)(7)(iii), the Bank was designated in "troubled condition" for purposes of CFR 5.51, with regards to deficiencies and concerns regarding Board and management oversight, strategic and capital planning, BSA Compliance, and concentration risk management.

24.     Carver's aforementioned inaction in not filing a SAR is in violation of 12 CFR 21.2(d)(1): Procedures for Monitoring Bank Secrecy Act Compliance-Contents of Compliance Program – System of Internal Control and 12 CFR 21.2(d)(3): Procedures for Monitoring Bank Secrecy Act Compliance – Contents of Compliance Program-BSA Compliance Officer.

25.     To date, the Bank continues to do business with Assad as an independent broker.

26.     Mottley, Raborn, and Monique Allen, a former employee, were blamed for Assad's termination.

27.     Senior Management had requested that Raborn, in his on-boarding interview with

4

the OCC for their annual examination, not mention his findings regarding the Assad incident, as this could lead to Assad's termination and finding a replacing would be difficult and embarrassing to Carver.

28.    Raborn, however, contrary to Senior Management's instruction, informed the OCC of this incident.

29.    Further, Mottley had periodic disagreements with Assad concerning Mottley's concerns that some of Assad's criteria for underwriting other deals may have been non-GAAP in nature.

30.    When Mottley raised these concerns to Craig Hamilton, then-Chief Credit Officer, Hamilton escalated the concerns to Senior Management, explaining that Mottley, Raborn and Monique all collaborated to expose the fraud.

### Mottley Assumes Interim CCO Duties

31.    In or around January 2015, Plaintiff's manager, Craig Hamilton ("*Hamilton*"), then-Chief Credit Officer ("*CCO*") resigned, and Mottley, as Senior Credit Officer, assumed his duties until Hamilton's replacement, Luis Tio ("*Tio*"), was hired in or around April 2015.

32.    In or around January 2015, Plaintiff interviewed for the position of Chief Compliance Officer (CCO) with Michael Pugh, Carver's Chief Executive Officer ("*Pugh*"), as well as senior management.

33.    Pugh told Mottley that, while Mottley is a technical genius, he (Pugh) felt that Mottley needed more industry knowledge.  Pugh stated that he would be hiring another CCO who would train Mottley as his future replacement.

34.    Pugh also stated, **"You needed to better influence your peers. If I were to put you in the room with Pinnock [an attorney and litigator with decades**

5

more experience], Pinnock would eat you alive [relative to communication styles]."

35.     Pugh also stated to Mottley that there are three kinds of people in the world: people who have technical abilities, those who have some technical and social skills, and the few who have technical, social and emotional intelligence.

36.     In or around March 2015, Mottley again met with Pugh in a follow-up meeting and indicated that he had made progress towards focusing on developing those traits Pugh had highlighted.

37.     Again, Pugh told Mottley, **"Not everyone can acquire all three traits, sometimes people are who they were made to be."**

38.     At this meeting, Plaintiff requested from Pugh an increase in salary based upon his outstanding performance.  In response, Pugh dismissed this request, stating that Mottley was **"earning at the top of his pay class as a Vice President of Carver."**

39.     On or about April 9, 2015, Plaintiff received a $1,000 cash bonus and public acknowledgement in the boardroom for outstanding performance exceeding standards.

<u>Luis Tio</u>

40.     In late April 2015, Luis Tio ("*Tio*") joined the Bank as CCO and Mottley's new manager. Tio is an acquaintance and/or friend of Assad, Carver's former Chief Lending Officer.

41.     In or around May or June 2016, Tio made statements to Mottley and others that **"there are three people who are major problems at Carver and need to be gotten rid of: James Raborn, David Toner and Blondel Pinnock."**

42.     From approximately May 2015 onwards, Tio commenced overt hostilities towards

6

Mottley.

43.     On multiple occasions, Tio verbally berated Mottley by loudly shouting, **"This is crazy, crazy, crazy."**

44.     Tio also threatened numerous times that if Mottley did not come into work over the weekend that **"there will be consequences you will regret on Monday."**

45.     Tio would also recite stores of his brother, whom he stated was once rich but because of certain traits became poor, and that Mottley similarly possessed the same bad traits.

46.     Each of these incidents left Mottley feeing scared, intimidated, violated, and afraid for his career at the Bank.

**Complaints of Hostile Work Environment**

47.     Carver has a history of, and continues to maintain, a hostile work environment charged with racial animus. Other employees may have recently complained of hostile working environment against Pugh, and the Bank has undertaken an investigation into these allegations. Moreover, there exists a pervasive culture at Carver where employees are intimidated and fearful that their employment would be terminated if they challenge Senior Management concerning their (Senior Management) wrongdoing.

48.     As an example, on or about April 17, 2017, the OCC, while conducting their annual examination, requested from Tio a number of Borrowers loan files for audit of the Portfolio Management Department loan review safety and soundness.  One such Borrower's file requested by the OCC was a $2 million line of credit/term loan to RDC Commercial Center Inc. ("*RDC*"), and Bedford Stuyvesant Restoration Center, Inc. ("*BSRC*"), as co-borrowers.  Principal on the loan is Colvin Grannum, President& CEO of RDC and BSRC, and <u>Board Member of Carver</u>. Based upon these facts and circumstances this loan qualifies as a Regulation O (12 CFR 215)

7

Extensions of Credit to Insiders and Transactions with Affiliates.  Regulation O governs any extension of credit by a member bank to an executive officer, director, or principal shareholder of that bank, of a bank holding company of which the member bank is a subsidiary, and of any other subsidiary of that bank holding company, and receives heightened scrutiny by the OCC.

49.    Tio handed the loan file over to the OCC but did not document the file as to show known facts and circumstances arising from his recent meeting with the Borrower, such as (i) the existence of multiple tax liens, (ii) Borrower inability to paid water bills, (iii) knowledge that Borrower's Chief Financial Officer recently experienced a severe injury to her back and is unable to return to work, and that Borrower did not hire a replacement staff to perform her duties, and as a result the Borrower is in financial dire straits, (iv) Borrower's accountant is unpaid for past work and is refusing to  prepare updated financials, leaving the Bank unable to get updated financial statements to verified the capacity of the Borrower to repay the loan, (v) Borrower has a ground lease expiring in 2018 and is unable to negotiate an extension with the leaseholder, thus, putting the Bank's capital in further jeopardy as the loan maturity date is past the ground lease expiry date.

50.    Although Tio and Senior Management are aware of the multiple deficiencies in the loan, Tio risk rated the loan PASS.  A PASS risk rating means that the loan is performing without deficiencies.  Tio is aware the loan presents a clear and present risk to the capital of the Bank and that said loan should be moved to Carver Workout Department and downgraded to Substandard risk rating in accordance to Carver's Lending Policy.

51.    First, Tio's action seeks to deceive the OCC into believing that the loan is sound and that the Borrower has no material deficiencies.  Second, Tio's action, as personal benefit, ensures that board members Grannum and Pugh are not made to be upset by any adverse action

8

taken with the loan. Third, all other similar loans at Carver would receive a downgrade and transfer to workout. Fourth, Tio inaction to properly inform the OCC on the actual status of this loan reflect preferential treatment, multiple concessions to a board member, and is a violation of Regulation O, Fair Lending Laws and Regulation B and Carver's Lending Policy.

52.    Although Tio's subordinates were aware of his inaction and deception with the OCC, the pervasive culture and Carver causes them to fear the consequences of receiving disparaging and hostile remarks from Senior Management, adverse performance ratings, and/or termination of employment for informing the OCC on the actual status of this loan.

53.    On or about July 31, 2015, James Raborn, General Counsel, sent a letter to Yvette Encarnacion, Senior Vice President & Chief of Human Resources Department ("*Encarnacion*"), indicating that Tio was creating a hostile work environment, and that several other employees had complained and/or reported a hostile working environment created by Tio.

54.    Raborn stated that he experienced Tio's behavior first-hand.

55.    On or about August 8, 2015, Mottley sent a letter to Encarnacion refuting recent assertions from Tio that his (Mottley's) work was of poor quality.

56.    On or about August 17 and 19, 2015, Encarnacion wrote to Mottley stating that she would conduct a speedy and fair investigation into Mottley's allegation of hostilities by Tio.

57.    In or around September 2015, Mottley learned from a colleague, Anthony Hood ("*Hood*"), one of the individuals who had recently complained and/or reported on Tio's hostile behavior, that Encarnacion had contacted him to assure him the Bank still held him in good standing.

58.    Hood stated to Mottley that he believed this was a form of coercion against complaining against Tio, specifically, to encourage him to keep silent. Hood subsequently left

9

the Bank.

59.     In or around August 2015, Mottley received the lowest performance review he had ever received at Carver since joining the Bank.  Specifically, Tio assigned Mottley a score of 3.2 out of 5. While the review was for the period ending March 31, 2015, it encompassed events through August 2016.

60.     Mottley subsequently wrote a rebuttal, and Pugh called a meeting (between Mottley, Tio and himself), requesting that Mottley write minutes for Pugh's rebuttal.

61.     On or about September 2, 2015, Mottley overheard Tio telling two of Mottley's coworkers that **"people who go to Ivy League schools do not always have the same skills and work ethics as people who go to non-Ivy League schools."**

62.     On or about October 2015, and continuing for several months, Mottley, being caused to suffer great emotional and psychological distress, depression and harm to his career at the Bank, sought help from a certified therapist, Dr. Lyon Dickerson of 127th Street, Harlem, New York.

63.     On or about September 24, 2017, Encarnacion wrote to Mottley stating that she had concluded an investigation and found no evidence of a hostile work environment.  Encarnacion also stated, **"The Bank will hire an outside firm to confirm their (Carver's) investigation findings."**

64.     In or around September 2015, the bank hired Tom Ciacomaro, an Investigation Consultant ("*Ciacomaro*") from ADP LLC, a long-time vendor of the Bank, to conduct another investigation.

65.     In or around September 2015, Mottley learned from a former HR employee that Ciacomaro was reporting directly to Pugh instead of Encarnacion.

10

66.     Ciacomaro's findings, dated November 6, 2015 and subsequently mailed to Mottley, found no evidence of a hostile working environment, despite clear evidence to the contrary.

67.     On or about November 29, 2016, Tio emailed Mottley in response to Mottley's salary review request suggesting in no uncertain terms that Pugh wanted Mottley to resign.

68.     Egregiously – and especially so, given that Carver is a minority managed bank in Harlem, New York – Tio stated that Pugh had called Plaintiff **"crazy in the head"** for asking for a raise and an **"ape in boots"**:

69.     Specifically, Tio stated in an email dated November 29, 2016, ". . . now you come back asking for these things [a raise].  He thinks that **apes in boots** (lol) should not complain and that you need to learn That no means no negotiable…".

*Please see image of this email on the following page*

11

**Shaun Mottley**

| | |
|---|---|
| **From:** | Luis Tio |
| **Sent:** | Tuesday, November 29, 2016 6:33 PM |
| **To:** | Shaun Mottley |
| **Subject:** | FW: Salary |

Shaun

I didn't have a second to get a response to you earlier last week. But after our talk I did speak with Michael about your request for salary increase and he said that when you interviewed with him
for the CCO position before I came here  he told you that you were being paid at the top of your level for a VP.  He said he did not give you the position and pay because you don't communicate well and can't represent the bank in front of the OCC etc.

He was a little angry that this is being raised again as you recently got a raise in pay and we were good to give you an adequate perform rating. He also mentioned that was why he told Raborn that you were crazy in the head because you repeated those other things he said to you and now you come back asking for these things.  He thinks that apes wearing boots (lol) should not complain and that you need to learn
That no means no negotiable..

Also Michael has decided to get rid of older employees here more than 5 years and Shaun I think that at the end of the day the best advice after all that has happened over the past year is that you look for another job because I don't think you will get
Promoted her anymore. Like I told you before Shaun  we could have fired you if we choose to last year but we changed our minds.  Please don't make any more trouble.

Come to my office to discuss when you get a chance.

Luis

**From:** Shaun Mottley
**Sent:** Wednesday, November 23, 2016 12:29 PM
**To:** Luis Tio
**Subject:** Salary

Luis,

I would like to speak to you about my improving my salary.

Regards
Shaun

Shaun Mottley, Vice President
Credit Risk Department
**Carver Federal Savings Bank | T:** 212.360.8826 | **F:** 718.230.2900
Harlem Office: 75 West 125th St., New York, N.Y. 10027
shaun.mottley@carverbank.com

70.     On or about January 10, 2017, Tio emailed Mottley stating that Pugh viewed his staff negatively and, specifically, that Pugh had said, **"I feel like a thorough breed horse working in a stable of mules."** Tio furthermore and egregiously stated that he felt **"the same way with this request of you [Mottley]."**

### Mottley Is Denied Opportunities for Advancement

71.     In or around January 2017, Gerald Wight, Vice President, Head of Portfolio Management ("*Wight*"), resigned from Carver.

72.     Mottley expressed interest in the position, for which he was fully qualified and which pays approximately $115,000 annually; and subsequently applied.

73.     Around the same time, Tio stated, **"it's a good idea to combine [Mottley's] current duties with Wight's duties"** and to put Mottley in charge of running the Portfolio Management Department.

74.     To date, the Bank continues to interview external candidates for the Senior Credit Portfolio Manager/Head of Portfolio Manager position, but Mottley was never interviewed.

75.     Several of Mottley's coworkers asked him repeatedly when was he going to get the position or the interview.

76.     Mottley's coworkers also stated to him that Senior Management would never give him the position because of his declined status within Carver.

77.     On or about January 3, 2017, Tio wrote to Pugh that he intended to hire someone for the role with a profile similar to his so that Senior Management could close the gap of the secession plan, even though it would cost Carver more money.

78.     Pugh agreed that a stronger "people" manager was needed for succession planning.

79.     On or about April 1, 2017, in a follow-up email, Tio stated to Pugh that they

(Senior Management) can **"assign a full or partial portfolio to the Head of PM (once hired), but the individual will have to take a balance responsibility of managing money and accounts."**

80.     In or around April 3, 2017, Tio emailed Mottley stating that he heard a story about Monique, a former employee, who, a few years ago, was choked by an HR employee in front of several staff members. Carver – despite having full knowledge of the event – took no action.

81.      Tio further stated to Mottley in the email that **"at the end of the day if I choked you, that the same thing might happen, nothing. I might as well be Trump standing in [on] Fifth Avenue."**

82.     In or around April 2017, Management decided that Plaintiff would be the Manager of the Graduate Student Medical loan pool at the Bank.  For reasons explained more fully below, this caused the Plaintiff to suffer great emotional and psychological distress and concern for his career in the financial industry.

83.     Plaintiff continues to be excluded from most staff meetings and from training critical to his exercising his current duties as well as his duties as stated under his 2014 job description.

### Consecutive History of the Student Pool Purchase

84.     As previously mentioned, on or about September 30, 2015, an OCC Report of Examination was issued, and later superseded by a Formal Agreement dated May 9, 2016, by and between Carver and the OCC, listing Carver as a "Trouble Bank" with several matters requiring attention ("*MRAs*").

85.     Additionally, in or around October 2016, Carver entered into a Memorandum of

14

Understanding ("*MOU*"), recommended by the Federal Reserve Bank of Philadelphia ("*Reserve Bank*"), which states that, while Carver Bancorp, Inc. is currently operating under a Board Resolution adopted by Carver's Board on October 23, 2015, the Reserve Bank recommended that Carver enter into a MOU, a more severe informal enforcement action, with the Reserve Bank in order to more closely align with the underlying formal enforcement action at Carver and to address the Bank's current supervisory concerns.

86.     Therefore, Carver's Board, at a duly constituted meeting, adopted a resolution agreeing to enter into a MOU on behalf of Carver and consenting to compliance with each and every provision of the MOU by Carver and its institution affiliated parties, as defined in sections 3(u) and 8(b)(3 of the Federal Deposit Insurance Act, as amended (the "*FDI Act*") (12 U.S.C. §1813(u) and 1818(b)(3).

87.     Specifically, by entering into a MOU with the Reserve Bank, Carver's Board agreed to take appropriate steps to fully utilize Carver's financial and managerial resources, pursuant to 38A of the FDI Act (12 U.S.C §1831-1) and section 238.8(a) of Regulation LL of the Board of Governors of the Federal Reserve System (Board of Governors) (12 C.F.R § 238.8(a)), to serve as a source of strength to the Bank, including, but not limited to, taking steps to ensure that the Bank complies fully with the Formal Agreement entered into with the OCC, dated May 24, 2016, and with any other supervisory actions taken by the Bank's primary regulator.

88.     On or about January 5, 2017, Blondel Pinnock, Senior Vice President & Chief Lending Officer ("*Pinnock*"), emailed Pazel Jackson ("*Jackson*"), Head of the Asset & Liability Committee ("*ALCO*"), a memorandum on the proposed Student Graduate Medical School lending Program for Jackson to review.

89.     On or about January 25, 2017, Tio and Pinnock presented to a Memo and Program

15

Offering for approval to ALCO; and later on the same day, to the full Board of Directors. This was approved.

90.    On or about January 26, 2017, in a meeting attended by Pugh, Pinnock, Tio, Plaintiff, Christian Meir, CFO ("*Meir*"), and others, a decision was made to purchase the Medical Graduate Student Loan pool in February 2017 and book the loan as a receivable on Carver's balance sheet so as to conceal them from the OCC upon their examination beginning on or about March 20, 2017.

91.    Meir pointed out that the agreement with Ed Invest and Broker LPC is that Carver can resell the $4.1 million pool of loan back to Ed-Invest if bank does not receive a non-object from the regulators.

92.    At the meeting, Mottley stated that this was a bad idea. Mottley was ignored.

93.    On or about February 2, 2017, Carver entered into a purchase arrangement with the seller, Ed Invest, to purchase $4.1 million in medical graduate student pool loans serviced by Great Lakes.

94.    Later in February 2017, OCC Regulatory issued a letter to Carver reminding them that they have to first seek non-objection before they purchase any new products or change their strategy or product delivery channel, etc.

95.    Over the course of March 2017, Carver submitted an application package (financial and budgetary planning, compliance, credit and business plan information) to obtain a non-objection (approval) from the OCC to purchase a $9 million pool of loans.

96.    On or about March 24, 2017, Senior Management, relative to their purchase of the Medical Graduate Student Loan pool, began receiving monthly reconcilement statements, earned interest statements, lender summary reports, transaction breakdown report, retained interest

statements, statistical statements, delinquency and other asset quality performance reporting from ED-Invest.

97.      On or about April 12, 2017, David Dorman, from ED Invest, emailed the Bank confirming the closing of the $4.1 million pool of medical student loans transaction.

98.      On or about April 14, 2017, the OCC issued a letter stating that they were unable to grant a non-objection (approval) to Carver because of reasons specified in its letter—namely, that based upon their (OCC) review of the bank submitted information and in accordance with OCC Bulletins 2004-20 – Risk Management of New, Expanded, or Modified Bank Products and Services, and 2013-29 – Third Party Relationships, the bank needs to perform more due diligence and further support its analysis of the student medical loan portfolio purchase.

99.      As a result, the Supervisory Office did not provide a "No Supervisory Objection" for the purchase of the student medical loan due to the following:

   a)   Policies and Procedures – The Bank did not address whether it had developed and adopted written policy and procedures for purchasing and monitoring the student medical loans. The Bank should have provided suitable documentation to demonstrate that the Board approved written policy and procedures;

   b)   Loan Terms – Information should have be provided on co-signers for loans with credit scores under 680;

   c)   Portfolio Monitoring – The information submitted stated that the Chief Credit Officer, along with a Portfolio Manager, would oversee and monitor the student loans through reports from the servicers. In accordance with OCC Bulletin 2004-20, the expertise of individuals who will manage the student loan program must be discussed. The bank have should provided the expertise of the Chief Credit Officer

17

and the Portfolio Manager in terms of overseeing this product;

d)    <u>Risk Assessment</u> – The risk assessment performed by the bank was inadequate, as the assessment lacked sufficient support for the conclusion on the risks, the controls, and the overall risk level. Eddy Pierre Charles, Compliance Officer, performed the assessment with input from all lines of business. In particular, the risks identified were credit, external/market, reporting, operational/transactional, strategic, technology, legal, reputation, and compliance risk. Problematically, the sections lacked the specificity to address the risk identified.

e)    <u>Exit Strategy</u> – The Bank's exit strategy was limited to what the process would entail and did not include triggers on when to exit the activity.  The Board and Management did not designate metrics that would prompt an exit from a particular product (i.e., the percentage of delinquencies);

f)    <u>Portfolio Servicing</u> – Portfolio servicing information was limited and only stated that bank would receive delinquencies and forbearance data on a monthly basis. Further information should have been provided on the services' operations to ensure appropriate servicing controls, as outlined in OCC Bulletin 200-20 – *Uniform Retail Classification and Account Management Policy: Policy Implementation.*    Further, the Bank did not provide information on how the it would ensure that servicers would provide accurate and timely information.

g)    <u>Performance of Medical Loan Portfolio Since Origination</u> – The portfolio of loans for purchase were originated from 2008 through 2013, yet information on performance year-to-date were not provided.  If there were any insurance payouts from Reliamax made since the inception of the loan, that information should have

been presented in the analysis as well; and

h)      Information Submission – The analysis provided by the Bank contained summary information from source documents; however, documentation should have also be provided, such as draft contracts and engagements, financial statements, rating information on insurers/reinsurers. Additionally, with regards to being unable to grant a non-objection, the letter stated that it did not amend, modify, except, waive, or terminate any provision of the Formal Agreement, nor did it extend or change the time requirements set forth in the Formal Agreement.

100.    Further, the letter reminded the Board that any additional deviation from its strategic plan warrants a written determination of no supervisory objection by the Assistant Deputy Comptroller.

101.    To date, the Bank is currently revising its criteria and information in pursuit of approval.

102.    On or about April 21, 2017, from approximately 11:30AM to 2PM, Tio and Mottley had a meeting with the OCC – those present at the meeting representing OCC included: Shawn Ali, Nadri Persaud (Team Manager/Lead), Henry Mora ("*Mora*"), Jennifer Weeks and Lilian Mills.

103.    In this meeting, Mora asked Tio, **"During the period December 31, 2016 to present, did the Bank make any purchases of new loan products?"** Tio responded, **"No, we did not."**

104.    Since 2015, Tio, has been employed in the capacity of Chief Credit Officer at the Bank, and as a member of Senior Management is aware and has personal knowledge that the Bank did purchase $4.1 million in student graduate loans in January 2017, and that the graduate

medical student loans purchase do fall under the OCC's classification of new loan products.

105.    The presentation made in January 2017 by Tio and Blondel A. Pinnock, SVP & Chief Lending Officer, to ALCO, and separately to the Board of Directors, sought approval to execute a new BancAlliance Program and Student Medical Loan Program with details as follows:

(a)    The student Medical Loan Program approval is up to $9 million in purchases; and

(b)    The BancAlliance Program is to participate in Middle Market Commercial & Industrial Leverage Lending transactions up to $4 million (risky loans for M&A, Recapitalization, takeovers, etc.) with a firm called BancAlliance. Carver Management has to obtain a non-objection from the OCC for this program as well, and although they plan to submit an application with supporting documentation, they have not done so as of yet. However, they are currently reviewing loans to participate in (if they are acceptable to the Bank's level of risk and credit criteria) *without and before they get a non-objection*.

106.    Senior Management previously discussed this issue, but nevertheless proceeded without a non-objection from the OCC.

107.    To date, Carver has not closed on a Bank Alliance leverage loan.

108.    Carver Board of Directors (the "*Board*") has violated the terms of the Formal Agreement with the OCC and Federal Reserve by granting approval and/or allowing Senior Management to proceed with the purchase of a $1.4 million graduate medical student loan purchase pool without expressed prior non-objection from the OCC.

109.    Further, Carver's Board and Senior Management have entered into a conspiracy leading multiple violations of law wherein they have violated, and conspired to violate, the Formal Agreement and MOUs with the OCC and Federal Reserve with respect to purchasing and

causing to purchase the graduate student medical loan purchase pool, and knowingly providing and causing its employees to provide false and misleading information visa discussions, email, documentation and other forms of communication to the OCC relative to initiating action that deviates significantly from its Strategic Plan (that has received a written determination of a supervisory objection from the Assistant Deputy Comptroller and that has been adopted by the Board), without written determination of no supervisory objection from the Assistant Deputy Comptroller.

110.    Indeed, the Board did not give the Assistant Deputy Comptroller at least thirty (30) days advance, written notice of its intent to deviate significantly from the Strategic Plan, along with an assessment of the impact of such changes on the Bank's condition, including profitability analysis and an evaluation of the adequacy of the Bank's organizational structure, staffing, management information systems, internal controls, and written policies and procedures to identify, monitor and control the risk associated with the proposed significant deviation from the Strategic Plan including, but not limited to, the following: a change in the Bank's marketing strategies, products, and services, marketing partners, underwriting practices and standards, credit administration, accounting, collection strategies or operations, fee structure or pricing, accounting processes and practices, or funding strategy—any of which, alone or in aggregate, may have a material impact on the Bank's operations or financial performance, or any other changes in personnel, operations, or external factors that may have a material impact on the Bank's operation and financial performance in a manner acceptable to gain an expressed written non objection from the OCC.

111.    On or about May 1, 2017, Mottley emailed Tio to express his concern for the GSML [Graduate Student Medical Loan] programs:

## Shaun Mottley

| | |
|---|---|
| **From:** | Luis Tio |
| **Sent:** | Monday, May 01, 2017 3:11 PM |
| **To:** | Shaun Mottley |
| **Subject:** | RE: Graduate Student Medical Loan Program |

Shaun,

I m don't understand why you are concern. You did the analysis on both the servicer and the Surety Bond company and as we concluded, there is no credit risk on these transactions.
Credit should be the department monitoring the performance of the portfolio as we do with the 1-4 family. This is not Shaun Mottley or Luis Tio, It's credit. We need to make sure we inform our board, at least quarterly, on the performance of the portfolio.

Let's discuss offline.

Regards,

Luis

**From:** Shaun Mottley
**Sent:** Monday, May 01, 2017 1:30 PM
**To:** Luis Tio
**Subject:** Graduate Student Medical Loan Program

Luis,

I just want to reiterate my concern for us embarking on the GSML program.   I strongly believe at this time that we should not be
doing these loans at least not until all the paper work is approved and signed off on.

Additionally, with all due respect I am concern with having to be portfolio Manager on these loans before they have been vetted
and approved by the authority in question.

Regards
Shaun

**Shaun Mottley,** Vice President
Credit Risk Department
**Carver Federal Savings Bank |** T: 212.360.8826 | F: 718.230.2900
Harlem Office: 75 West 125th St., New York, N.Y. 10027
shaun.mottley@carverbank.com



*Did you know that 83 cents out of every dollar of Carver's deposits are reinvested in the communities we call home? To learn more, go to carverbank.com/communityImpact*

**Connect with Carver Bank:**

112.    In summary, Carver violated its Formal Agreement and the Federal Law when it engaged in the following acts or omissions:

a) Failing to operate the Bank in a safe and sound manner so as not to cause harm to its investors, stakeholders and others who may give reliance to it public financial filings and information, as required by its Formal Agreement with the OCC, Memorandum of Understanding with the Federal Reserve, and Carver's charter and mandate;

b) Failing to account for, record, journal, identify, and apply the necessary allowance for loan and lease losses reserves (as required by the FASB Accounting Standards and Codification), to the graduate medical student loan purchase pool in a manner consistent with Generally Accepted Accounting Principals (GAAP), standards and pronouncements;

c) Providing its auditors with inaccurate, misleading and false information, thereby causing its auditors, BDO USA LLP, BDP Audit & Assurance ("*BDO*") and Crowe Horwath, LP ("*Crowe*"), to rely upon false information in auditing, preparing, publishing, approving, making to appear in Carver's Call Report, 10Q, 10K, and other necessary and financial public disclosures and reporting; and

d) Acting in breach of its Formal Agreement with the OCC relative to Capital, Asset Quality, Management, Earnings, Liquidity – Asset/Liability Management, Sensitivity to Market Risk, Information Technology, Consumer Compliance, BSA, and all other regulations that may pertain to the violations of law under the Formal Agreement and MOUs with the Federal Reserve.

## FIRST CLAIM FOR RELIEF

### (DISCRIMINATION ON THE BASIS OF RACE IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964; 42 U.S.C. § 2000E)

113.     Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

114.     Defendants discriminated against Plaintiff on the basis of his race, African America, in violation of Title VII by failing to promote him on the basis of his race and denying his the same terms and conditions of employment available to other employees, including but not limited to using racial epithets in reference to them and denying them the opportunity to work in an employment setting free of unlawful discrimination.

115.     Defendants' animus towards Plaintiff's race is revealed in instances where similarly situated employees were treated differently than Plaintiff in respect to of their terms, conditions, and privileges of employment.

116.     Defendants have undertaken these discriminatory practices willfully or with reckless disregard for the Plaintiff's rights protected under Title VII.

117.     These employment practices violate § 703 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-2.

118.     As a result of Defendants' actions, Plaintiff is unable to return to comparable employment.

119.     The aforementioned acts of Defendants constitute unlawful discrimination against Plaintiff in the terms, conditions and privileges of her employment because of her gender and in retaliation against her in violation of the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e.

120.     As a proximate result of Defendants' aforementioned race discrimination against

24

Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

121.    As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to his personal and professional good name and reputation.

122.    As a further proximate result of Defendants' actions taken because of Plaintiff's race, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

123.    As a result of the foregoing, Plaintiff is entitled to recover from Defendants, jointly and severally, an amount equal to the value of all compensation to be earned by Plaintiff had his employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

124.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount to be determined at trial in compensatory damages from Defendants, in addition to all other amounts sought herein.

125.    In committing the acts alleged herein, Defendants, jointly and severally, acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages  in amount to be determined at trial to adequately punish Defendants and to deter Defendants from continuing and repeating such conduct in the future.

## SECOND CLAIM FOR RELIEF
### (DISCRIMINATION ON THE BASIS OF RACE IN VIOLATION OF 42 U.S.C. §1981)

126.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above

25

with the same force and effect as if more fully set forth herein.

127.    Section 1981 forbids any employer or agent thereof from discriminating against an employee on account of that employee's race.

128.    Defendants discriminated against Plaintiff on the basis of his race in violation of Section 1981 by failing to promote him and denying his the same terms and conditions of employment available to other employees, including but not limited to using racial epithets in reference to them and denying them the opportunity to work in an employment setting free of unlawful discrimination.

129.    Defendants discriminated against Plaintiff on the basis of his race in violation of Section 1981 by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent a hostile work environment that included, among other things, severe or pervasive racial discrimination against Plaintiff by his supervisors.

130.    As a direct and proximate result of Defendants' discriminatory and unlawful conduct in violation of Section 1981, Plaintiff has suffered and continue to suffer monetary and/or non-economic damages, including, but not limited to, loss of future income, compensation and benefits, mental anguish and emotional distress, loss of self-esteem and self-confidence, and emotional pain and suffering, for which they are entitled to an award of monetary damages and other relief.

131.    Defendants' unlawful and discriminatory actions constitute malicious, willful, and wanton violations of Section 1981, for which Plaintiffs are entitled to an award of punitive damages.

## THIRD CLAIM FOR RELIEF
### (DISCRIMINATION ON THE BASIS OF RACE UNDER
### NEW YORK CITY HUMAN RIGHTS LAW § 8-107)

26

132.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

133.    Defendants' discriminatory behavior as described herein was made as a direct result of Plaintiff's race and shows an animus of racial bias.

134.    Defendants' animus towards Plaintiff's race is revealed in instances as described herein in respect to of the terms, conditions, and privileges of employment.

135.    Plaintiff has been unable, despite reasonable efforts, to find comparable employment.

136.    The aforementioned acts of Defendants constitute unlawful discrimination against Plaintiff in the terms, conditions and privileges of his employment because of his race in violation of the provisions of the NYCHRL § 8-107.

137.    As a proximate result of Defendants' aforementioned sex discrimination against Plaintiff, Plaintiff suffered substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

138.    As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to his personal and professional good name and reputation.

139.    As a further proximate result of Defendants' actions taken because of Plaintiff's race, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

140.    As a result of the foregoing, Plaintiff is entitled to recover from Defendants, jointly and severally, an amount equal to the value of all compensation to be earned by Plaintiff had his employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

141.    As a result of the foregoing acts, Plaintiff is entitled to recover compensatory

damages from Defendants, jointly and severally, in addition to all other amounts sought herein.

142.    In committing the acts alleged herein, Defendants acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages to adequately punish Defendants, jointly and severally, and to deter Defendants from continuing and repeating such conduct in the future.

### FOURTH CLAIM FOR RELIEF
#### (DISCRIMINATION ON THE BASIS OF RACE UNDER NEW YORK STATE HUMAN RIGHTS LAW §296(1)(A))

143.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

144.    Defendants' discriminatory behavior was made as a direct result of Plaintiff's race and shows an animus of racial bias.

145.    Defendants' animus towards Plaintiff's race is revealed in instances as described herein in respect to the terms, conditions, and privileges of employment.

146.    The aforementioned acts of Defendants constitute unlawful discrimination against Plaintiff in the terms, conditions and privileges of his employment because of his race in violation of the provisions of the NYSHRL § 296(1)(a).

147.    As a proximate result of Defendants' aforementioned race discrimination against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

148.    As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to his personal and professional good name and reputation.

149.    As a further proximate result of Defendants' actions taken because of Plaintiff's race, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and

anguish and other incidental and consequential damages and expenses.

150.    As a result of the foregoing, Plaintiff is entitled to recover from Defendants, jointly and severally, an amount equal to the value of all compensation to be earned by Plaintiff had his employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

151.    As a result of the foregoing acts, Plaintiff is entitled to recover compensatory damages from Defendants, jointly and severally, in addition to all other amounts sought herein.

152.    In committing the acts alleged herein, Defendants acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages to adequately punish Defendants, jointly and severally, and to deter Defendants from continuing and repeating such conduct in the future.

### FIFTH CLAIM FOR RELIEF
**(HOSTILE WORK ENVIRONMENT RACE-BASED HARASSMENT IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964; 42 U.S.C. § 2000E)**

153.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

154.    Defendants discriminated against Plaintiff on the basis of his race in violation of the Title VII by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent a hostile work environment that included, among other things, severe or pervasive racially discriminatory, humiliating, offensive, derogatory inappropriate behavior, innuendo, remarks, comments, and discussions Carver.

155.    Defendants' knowledge, tolerance and acquiescence of a racially charged hostile work environment suffered by Plaintiff, is impermissible race based discrimination.

156.    Defendants allows to exist an offensive, discriminatory, and hostile work environment where a constant barrage of racially discriminatory, humiliating, derogatory and

inappropriate behavior, jokes, innuendo, remarks, gestures, comments, discussions was made, which is particularly offensive and directed towards Plaintiff.

157.    Defendants did not have policies in place to deal with a racially hostile work environment.

158.    Defendants failed to take reasonable steps to stop the harassment complained of herein.

159.    Defendants have undertaken these discriminatory practices willfully or with reckless disregard for the Plaintiff's rights protected under Title VII.

160.    These employment practices violate § 703 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-2.

161.    Plaintiff has been unable, despite reasonable efforts, to find comparable employment.

162.    The aforementioned acts of Defendants constitute hostile work environment race-based harassment against Plaintiff in violation of the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e.

163.    As a proximate result of Defendants' aforementioned hostile work environment race-based harassment against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

164.    As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to his personal and professional good name and reputation.

165.    As a further proximate result of Defendants' hostile work environment sexual harassment, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

166.    As a result of the foregoing, Plaintiff is entitled to recover from Defendants an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

167.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount to be determined at trial in compensatory damages from Defendants, jointly and severally, in addition to all other amounts sought herein.

168.    In committing the acts alleged herein, Defendants, jointly and severally, acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages in an amount to be determined at trial to adequately punish Defendants, jointly and severally, and to deter Defendants from continuing and repeating such conduct in the future.

**SIXTH CLAIM FOR RELIEF**
**(HOSTILE WORK ENVIRONMENT RACE-BASED HARASSMENT UNDER NEW YORK STATE HUMAN RIGHTS LAW §296(1)(A))**

169.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

170.    Defendants discriminated against Plaintiff on the basis of his race in violation of the NYSHRL by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent a hostile work environment that included, among other things, severe or pervasive racially discriminatory, humiliating, offensive, derogatory inappropriate behavior, innuendo, remarks, comments, and discussions Carver.

171.    Defendants' knowledge, tolerance and acquiescence of a racially charged hostile work environment suffered by Plaintiff, is impermissible race based discrimination.

172.    Defendants allows to exist an offensive, discriminatory, and hostile work

environment where a constant barrage of racially discriminatory, humiliating, derogatory and inappropriate behavior, jokes, innuendo, remarks, gestures, comments, discussions was made, which is particularly offensive and directed towards Plaintiff.

173.    Defendants did not have policies in place to deal with a racially hostile work environment.

174.    Defendants failed to take reasonable steps to stop the harassment complained of herein.

175.    Defendants have undertaken these discriminatory practices willfully or with reckless disregard for the Plaintiff's rights protected under the NYSHRL.

176.    These employment practices violate NYSHRL § 296(1)(a).

177.    Plaintiff has been unable, despite reasonable efforts, to find comparable employment.

178.    The aforementioned acts of Defendants constitute hostile work environment race-based harassment against Plaintiff in violation of the provisions of NYSHRL § 296(1)(a).

179.    As a proximate result of Defendants' aforementioned hostile work environment race-based harassment against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

180.    As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to his personal and professional good name and reputation.

181.    As a further proximate result of Defendants' hostile work environment sexual harassment, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

182.    As a result of the foregoing, Plaintiff is entitled to recover from Defendants an

amount equal to the value of all compensation to be earned by Plaintiff had his employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

183.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount to be determined at trial in compensatory damages from Defendants, jointly and severally, in addition to all other amounts sought herein.

184.    In committing the acts alleged herein, Defendants, jointly and severally, acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages in an amount to be determined at trial to adequately punish Defendants, jointly and severally, and to deter Defendants from continuing and repeating such conduct in the future.

## SEVENTH CLAIM FOR RELIEF
### (HOSTILE WORK ENVIRONMENT RACE-BASED HARASSMENT UNDER NEW YORK CITY HUMAN RIGHTS LAW §8-107)

185.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

186.    Defendants discriminated against Plaintiff on the basis of his race in violation of the NYCHRL by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent a hostile work environment that included, among other things, severe or pervasive racially discriminatory, humiliating, offensive, derogatory inappropriate behavior, innuendo, remarks, comments, and discussions Carver.

187.    Defendants' knowledge, tolerance and acquiescence of a racially charged hostile work environment suffered by Plaintiff, is impermissible race based discrimination.

188.    Defendants allows to exist an offensive, discriminatory, and hostile work environment where a constant barrage of racially discriminatory, humiliating, derogatory and

33

inappropriate behavior, jokes, innuendo, remarks, gestures, comments, discussions was made, which is particularly offensive and directed towards Plaintiff.

189.    Defendants did not have policies in place to deal with a racially hostile work environment.

190.    Defendants failed to take reasonable steps to stop the harassment complained of herein.

191.    Defendants have undertaken these discriminatory practices willfully or with reckless disregard for the Plaintiff's rights protected under the NYCHRL.

192.    These employment practices violate NYCHRL § 8-107.

193.    Plaintiff has been unable, despite reasonable efforts, to find comparable employment.

194.    The aforementioned acts of Defendants constitute hostile work environment race-based harassment against Plaintiff in violation of the provisions of NYCHRL § 8-107.

195.    As a proximate result of Defendants' aforementioned hostile work environment race-based harassment against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

196.    As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to his personal and professional good name and reputation.

197.    As a further proximate result of Defendants' hostile work environment sexual harassment, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

198.    As a result of the foregoing, Plaintiff is entitled to recover from Defendants an amount equal to the value of all compensation to be earned by Plaintiff had her employment not

34

been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

199.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount to be determined at trial in compensatory damages from Defendants, jointly and severally, in addition to all other amounts sought herein.

200.    In committing the acts alleged herein, Defendants, jointly and severally, acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages in an amount to be determined at trial to adequately punish Defendants, jointly and severally, and to deter Defendants from continuing and repeating such conduct in the future.

## EIGHTH CLAIM FOR RELIEF
### (Violation of Whistleblower Protection Under SOX)

201.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein.

202.    Plaintiff was denied promotional opportunities as a result of his lawful actions protected by Dodd-Frank whistleblower protection statutes, as described herein.

203.    Plaintiff's protected actions deem him a "whistleblower" under SOX.

204.    Plaintiff possessed a reasonable belief that Carver was engaged in activity that possibly constituted a fraud against shareholders, as defined under applicable Federal Law.

205.    Plaintiff engaged in a protected activity under SOX, his employer was aware of the protected activity, he suffered an adverse employment action and the protected activity was the sole reason behind Defendants' failure to promote him.

206.    Plaintiff engaged in protected activity as a whistleblower within the meaning of SOX because she engaged in protected activity as described herein.

207.    Defendants violated SOX by denying Plaintiff's promotional opportunities in

35

retaliation of his lawful actions and protected activity as a whistleblower.

208.     As a result of Defendants' conduct, Plaintiff has suffered substantial damages and is entitled to relief in the form of two times the amount of back pay otherwise owed, front pay, plus attorneys' fees, interest and costs and any other statutory relief available to him.

## NINTH CLAIM FOR RELIEF
### AGAINST TIO AND PUGH (NYSHRL - AIDING AND ABETTING)

209.     Plaintiff incorporates by reference and realleges each and every allegation as set forth above as if fully set forth herein.

210.     As a result of the aforementioned actions, Defendant has discriminated against Plaintiff on account of his race with respect to the terms, conditions and privileges of his employment in violation of New York Executive Law § 290 et seq.

211.     As a result of the aforementioned actions, Defendant has violated the New York Executive Law §290 et seq. by aiding, abetting, inciting and coercing the unlawful discrimination outlined herein.

212.     As a result of Defendant discrimination (and aiding, abetting and inciting discrimination) against her, Plaintiff has suffered damages, including, without limitation, deprivation of income and benefits, emotional pain, suffering, inconvenience, damage to reputation and career, mental anguish and humiliation.

## TENTH CLAIM FOR RELIEF
### AGAINST TIO AND PUGH (NYCHRL - AIDING AND ABETTING)

213.     Plaintiff incorporates by reference and realleges each and every allegation as set forth above as if fully set forth herein.

214.     As a result of the aforementioned actions, Defendant has discriminated against Plaintiff on account of his race with respect to the terms, conditions and privileges of his employment in violation of New York City Administrative Code § 8-101 et seq.

36

215.    As a result of the aforementioned actions, Defendant has violated the New York City Administrative Code § 8-101 et seq. by aiding, abetting, inciting and coercing the unlawful discrimination outlined herein.

216.    As a result of Defendant Carver's discrimination (and aiding, abetting and inciting discrimination) against him, Plaintiff has suffered damages, including, without limitation, deprivation of income and benefits, emotional pain, suffering, inconvenience, damage to reputation and career, mental anguish and humiliation.

### Attorney's Fees and Costs

217.    Attorney's fees and costs are warranted in this matter as the undersigned, on behalf of Plaintiff have in good faith, attempted to negotiate a reasonable resolution with Defendants without having to refer this matter to this forum for adjudication, determination and final resolution on the merits.

### Punitive Damages – Bad Faith

218.    It is presumed that parties to contracts undertake their respective obligations in good faith, with intent to deal fairly.  In light of Defendants' obvious and blatant bad faith, wrongdoing and breach of other duties, ***punitive damages*** should be assessed against Defendants so that it be deterred from attempting such harmful employment practices in the future.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court grant the following relief:

I.      For a determination that Defendants' violations as described above are willful;

II.     An award of Plaintiff's actual damages in respect of loss of wages, promotional opportunities, including an award of front pay compensating Plaintiff for loss of future salary and benefits had their employment not been interfered with, including all to be earned wages, costs, attorney's fees and prejudgment interest at no less than 9%;

III.    An award of compensatory damages not less than $2,000,000;

IV.     An award of punitive damages not less than $2,000,000;

V.      An order enjoining Defendants from engaging in the wrongful practices alleged herein;

VI.     Award Plaintiff prejudgment interest;

VII.    Award Plaintiff the costs of this action together with reasonable attorneys' fees; and

VIII.   Such other and further relief as this Court deems necessary and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all questions of fact raised by the complaint.

Dated: New York, New York
May 10, 2017

Respectfully submitted,

**SACK & SACK, LLP**

By:   Eric Stern, Esq.
Attorneys for Plaintiff
70 East 55th Street, 10th Floor
New York, New York 10022
Tel.: (212) 702-9000
Fax: (212) 702-9702